**In re COMMITMENT OF Wesley MILLER.**

**No. 09–07–062 CV.**

Court of Appeals of Texas, Beaumont.

Submitted Dec. 21, 2007.

Decided Aug. 28, 2008.

George W. Lang II, Jacqueline C. Stewart, Michael S. Falkenberg, State Counsel for Offenders, Huntsville, for appellant.

Kerrie Hergenrader, Special Prosecution Unit, Civil Div., Huntsville, for appellee.

Before GAULTNEY, KREGER, and HORTON, JJ.

## OPINION

HOLLIS HORTON, Justice.

In 2006, a jury determined that Wesley Miller was a sexually violent predator. *See* Tex. Health & Safety Code Ann. § 841.003 (Vernon 2003). Miller appeals from the trial court's judgment and order of civil commitment. Among other issues, he challenges the constitutionality of amendments to the Texas Sexually Violent Predator Act ("SVPA" or "Act") that allow a crime "based on sexually motivated conduct" to serve as a predicate offense. *See* Tex. Health & Safety Code Ann. § 841.002(7–a), (8)(D) (Vernon Supp.2007). We affirm.

### I. Statute and Its Amendments

The Act[1] provides for the involuntary civil commitment of an offender to outpatient treatment and supervision if the offender is found to be a sexually violent predator ("SVP"). *See id.* § 841.081. A sexually violent predator, by statutory definition, is a person who "(1) is a *repeat* sexually violent offender; and (2) suffers from a behavioral abnormality that makes the person likely to engage in a predatory act of sexual violence." Tex. Health & Safety Code Ann. § 841.003(a) (Vernon 2003) (emphasis added). A repeat sexually violent offender is one who has been convicted of more than one sexually violent offense and a sentence is imposed for at least one of the offenses. *Id.* § 841.003(b).[2]

Prior to 2005, the qualifying predicate offenses that could lead to commitment under the Act included, among others, sexual assault (Penal Code section 22.011) and aggravated sexual assault (Penal Code section 22.021). Act of May 30, 1999, 76th Leg., R.S., ch. 1188 § 4.01, sec. 841.002(A), 1999 Tex. Gen. Laws 4143, 4144 (current version at Tex. Health & Safety Code Ann. § 841.002(8)(A) (Vernon Supp.2007)); *see* Tex. Pen.Code Ann. §§ 22.011, 22.021 (Vernon 2003 & Supp.2007). In 2005, the Texas legislature expanded the list of qualifying offenses to include murders and capital murders that are "determined beyond a reasonable doubt to have been based on sexually motivated conduct." Act of May 23, 2005, 79th Leg., R.S., ch. 849 § 1, sec. 841.002(8)(D), 2005 Tex. Gen. Laws 2890, 2891 (amendment codified at Tex. Health & Safety Code Ann. § 841.002(8)(D) (Vernon Supp.2007)); *see* Tex. Pen.Code Ann. §§ 19.02, 19.03 (Vernon 2003 & Supp. 2007).

The amendments further define "sexually motivated conduct" as "any conduct involving the intent to arouse or gratify the sexual desire of any person immediately

---

1. The Sexually Violent Predator Act is located in Title 11, Chapter 841 of the Texas Health and Safety Code. *See* Tex. Health & Safety Code Ann. §§ 841.001–841.150 (Vernon 2003 & Supp.2007).

2. Certain definitions of "repeat sexually violent offender" are not applicable here, such as one that also includes offenses for which the person is found not guilty of a sexually violent offense by reason of insanity. *See id.* § 841.003(b)(1), (2) (Vernon 2003).

before, during, or immediately after the commission of an offense." 2005 Tex. Gen. Laws at 2890 (amendment codified at TEX. HEALTH & SAFETY CODE ANN. § 841.002(7–a) (Vernon Supp.2007)). One of the predicate offenses for Miller's commitment was a murder conviction that the State alleged had been based on sexually motivated conduct. In his appeal, Miller challenges the constitutionality of the 2005 amendments.

## II. Background

In 1982, a jury convicted Miller for murdering Retha Stratton and assessed his punishment at twenty-five years in prison. As he neared the end of his prison term, the State filed a petition to commit him under the Act. In the SVP proceeding, the State alleged that the two required predicate offenses were Miller's conviction of burglary with intent to commit rape and his murder conviction.

In this case, the State undertook the burden of proving during Miller's civil commitment proceeding that Stratton's murder had been sexually motivated. At Miller's civil commitment trial, the State introduced evidence relevant to that issue. That evidence included Miller's statement that he gave to Detective Dennis Timmons on January 23, 1982, regarding Retha Stratton's murder. Timmons was present when Miller signed the statement. Miller's statement explained events preceding the murder. Miller stated that just prior to the murder, Stratton "started coming on to me and I cooperated until she backed off so I stopped." [3] Miller then explained that Stratton "started coming on to me again and I did not stop this time when she backed off and we started fighting." At that point, Miller implied he believed that Stratton reached for a knife, the knife

fell onto the floor, and he picked the knife up and stabbed her.

At Miller's commitment trial, Timmons described the homicide scene at Retha Stratton's home. Timmons testified that Stratton had been stabbed repeatedly in the left breast, the knife was left embedded in her chest, both breasts were exposed, and her underpants had been stuffed into her mouth.

At his commitment trial, Miller testified that he was sexually attracted to Stratton but he was not interested in marriage. He agreed that his goal the evening of the murder was sexual intercourse and that he was interested only in sex.

Three expert witnesses testified about the sexually motivated conduct associated with Stratton's murder: Dr. Jack Price, a psychologist who is board certified in forensic psychology and neuropsychology; Dr. Michael Arambula, a physician who specializes in psychiatry, with a subspecialty in forensic psychiatry; and Dr. Jason Dunham, a forensic psychologist.

Dr. Price viewed the crime scene photographs in evaluating whether the murder of Retha Stratton was based on sexually motivated conduct. He testified:

I can see no other reason other than something related to sex. That the victim is unclothed from the breasts down. Her panties are stuffed in her mouth. The stab wounds concentrate on the breast. She is placed in a position with her legs spread apart. There's just no other explanation.

Dr. Price also reviewed an autopsy photograph and explained its significance:

Well, as opposed to the other photograph, where the blood covered up the

---

**3.** "Come on" is a slang term, one of the meanings of which is "to make a sexual advance." 1 Random House Historical Dictionary of American Slang (J.E. Lightner ed., Random House 1994).

exact stab wounds, here you can see them very clearly and that they concentrate on the breast, not in the center of the chest, not all over ... they were focused—the attention was on the breast. That indicates sexual thinking on the part of the offender. It—that's his focus.

Dr. Arambula testified that "[s]exually motivated conduct was a part of the murder...." Dr. Arambula noted that Miller and Stratton were "kissing and petting. That's sexually stimulating.... So that element is already there." Dr. Arambula further explained that sexual motivation was indicated by behavioral symbolism present at the murder scene. The elements considered important by Dr. Arambula were the removal of Stratton's clothing, the mutilation cuts, the knife left in Stratton's chest as a phallic symbol, the positioning of her body, and the panties stuffed into her mouth.

Miller called Dr. Dunham to contradict the testimony of other witnesses regarding the sexually motivated nature of Stratton's murder. Dr. Dunham testified that he did not "see how someone can say for certain what happened there and what was the motivation behind that." Significant to Dr. Dunham was the absence of any indication of rape and the absence of semen. If sexual motivation had been the reason for the murder, Dr. Dunham doubted that Miller would have been able to resist the temptation to rape Stratton. As to any sexual symbolism present at the murder scene, Dr. Dunham noted that such interpretations were not based on "a hard science."

### III. Miller's Issues

In issue one, Miller asserts that the Act, as amended, is punitive and therefore unconstitutional. Issue two asserts that his civil commitment proceeding is barred by constitutional prohibitions against double jeopardy. Issue three asserts that the amended Act constitutes an unlawful bill of attainder. Issue four contends that the Act, as amended, is void for vagueness. Issues five and six challenge the adequacy of the trial court's jury charge. Issue seven argues that the doctrine of res judicata bars his commitment proceedings. Issue eight asserts that the trial court inappropriately imposed a child safety zone in its commitment order.

### IV. Is the Act Punitive?

■ Miller argues in issue one that the amended Act is punitive and, thus, unconstitutional because the commitment proceedings brought against him violated his due process rights by not providing him with the protections of criminal procedure. In arguing the Act is punitive, Miller contends that the amended statute seeks retribution and requires a retroactive determination of why he committed the murder.

The amendments allow murder and capital murder to serve as predicate offenses for commitment if they are "determined beyond a reasonable doubt to have been based on sexually motivated conduct[.]" TEX. HEALTH & SAFETY CODE ANN. § 841.002(8)(D). The determination may be made "during the guilt or innocence phase or the punishment phase for the offense ... or subsequently during a civil commitment proceeding...." *Id.* In this case, the State sought to prove during Miller's civil commitment hearing that the murder was sexually motivated.

Miller does not argue that any difference between the Texas constitution and the federal constitution is material to his case. *See In re Commitment of Fisher,* 164 S.W.3d 637, 645 (Tex.2005). His constitutional arguments are based primarily on cases decided by the United States Supreme Court. Because material differ-

ences are not apparent, "we limit our analysis to the United States Constitution and assume that its concerns are congruent with those of the Texas Constitution." *Id.* Our analysis of a statute's constitutionality "begins with a presumption of validity." *Id.* In *Fisher*, the Texas Supreme Court addressed the constitutionality of a prior version of the SVP statute and held that it was not punitive. *Id.* at 653. In determining whether commitment proceedings under the statute violated Miller's due process rights, we first must determine whether the amendments have caused the Act to become punitive. *See id.*

Under the Act, the Texas Supreme Court held that commitment proceedings were civil rather than criminal. *Id.* at 639, 647 (relying on *Kansas v. Hendricks*, 521 U.S. 346, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997)). The *Fisher* Court further noted that courts in fourteen states had determined that their SVP statutes were civil. *Id.* at 646.[4] At least two other states, New Hampshire and New York, have enacted SVP statutes since *Fisher* was decided. *See* N.H. Rev. Stat. Ann. §§ 135-E:1-:23 (LexisNexis 2008) (enacted in 2006); N.Y. Mental Hyg. Law §§ 10.01-.17 (LexisNexis 2008) (enacted in 2007). Further, the United States Congress has as well. 18 U.S.C. § 4248 (enacted in 2006); *see United States v. Carta*, 503 F.Supp.2d 405, 407 (D.Mass.2007).

In determining that proceedings under the Act were civil, the *Fisher* Court applied the "intent-effects" test. *Fisher*, 164 S.W.3d at 647 (citing *Moore v. Avoyelles Corr. Ctr.*, 253 F.3d 870, 872 (5th Cir. 2001)). Under this test, the appellate court first examines legislative intent and then reviews the statute's effects. *Id.* The court rejects the legislative intent to establish a civil statute "only where a party challenging the Act provides 'the clearest proof' that the statutory scheme is so punitive in either purpose or effect as to negate the State's intention." *Id.* (quoting *Hendricks*, 521 U.S. at 361, 117 S.Ct. 2072, 138 L.Ed.2d 501). After determining that the legislature intended for the Act to be civil, the *Fisher* Court analyzed the Act's purposes and effects pursuant to the *Kennedy* factors. *Id.* at 647–48 (citing *Kennedy v. Mendoza–Martinez*, 372 U.S. 144, 168–69, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963)). *Fisher* noted that the *Kennedy* factors[5] are "'neither exhaustive nor dispositive[.]'" *Id.* at 647 (quoting *United States v. Ward*, 448 U.S. 242, 249, 100 S.Ct. 2636, 65 L.Ed.2d 742 (1980)). In addition, the *Fisher* Court noted that the *Kennedy* factors "'may often point in differing directions' and 'must be considered in relation to the statute on its face.'" *Id.* at 648 (quoting *Kennedy*, 372 U.S. at 169, 83 S.Ct. 554). After completing its *Kennedy* examination of the Act's effects, the Texas

---

4. The fourteen states recognized in *Fisher* were: (1) Arizona, (2) California, (3) Florida, (4) Illinois, (5) Iowa, (6) Kansas, (7) Massachusetts, (8) Minnesota, (9) Missouri, (10) New Jersey, (11) North Dakota, (12) South Carolina, (13) Washington, and (14) Wisconsin. *See In re Commitment of Fisher*, 164 S.W.3d 637, 646 (Tex.2005).

5. The *Kennedy* factors include:
(1) whether the sanction involves an affirmative disability or restraint; (2) whether it has historically been regarded as a punishment; (3) whether it comes into play only

on a finding of scienter; (4) whether its operation will promote the traditional aims of punishment—retribution and deterrence; (5) whether the behavior to which it applies is already a crime; (6) whether an alternative purpose to which it may rationally be connected is assignable for it; and (7) whether it appears excessive in relation to the alternative purpose assigned.

*Id.* at 647 (citing *Kennedy v. Mendoza–Martinez*, 372 U.S. 144, 168–69, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963)).

Supreme Court concluded that the Act was civil in nature. *Id.* at 653.

Scienter and retribution were two of the seven factors discussed in *Kennedy.* 372 U.S. at 168–69, 83 S.Ct. 554. Miller focuses on these two factors to support his argument that the amendments make the SVP statute punitive. *See id.*

■ The party challenging the statute has the burden to establish the statute is unconstitutional. *Walker v. Gutierrez,* 111 S.W.3d 56, 66 (Tex.2003); *Gen. Servs. Comm'n v. Little–Tex Insulation Co.,* 39 S.W.3d 591, 598 (Tex.2001). When possible, we are to uphold the statute and "interpret legislative enactments in a manner to avoid constitutional infirmities." *Barshop v. Medina County Underground Water Conservation Dist.,* 925 S.W.2d 618, 629 (Tex.1996); *see Little–Tex,* 39 S.W.3d at 598.

### Scienter

As to his motives to commit the murder, Miller argues that the SVPA amendments "single out those who committed their crime in a specific mindset, with intent of sexual gratification." He further argues that "as applied to any candidate being sued based on a murder or capital murder conviction," commitment is allowed only "with a finding of scienter, tipping the scales in favor of a finding that the SVP Act is intended as punishment."

Initially, we note that under *Kennedy,* we are to consider whether the "sanction," (involuntary commitment) "comes into play *only* on a finding of scienter[.]" *See Kennedy,* 372 U.S. at 168, 83 S.Ct. 554 (emphasis added). In *Fisher,* the Texas Supreme Court found that the commitment proce-

dure existing before the amendments involved no finding of scienter, and those procedures still apply for commitments based on predicate offenses other than sexually motivated murder. *See* 164 S.W.3d at 649. Thus, the statute, as amended, would not always operate to require scienter-type findings in all SVP cases. *Cf. Capps v. State,* No. 01–07–00298–CR, 265 S.W.3d 44, 50–51, 2008 WL 963139, at *5 (Tex.App.-Houston [1st Dist.] Apr. 10, 2008, no pet. h.) (not yet released for publication) ("While it may be true that appellant's culpable mental state was considered by the court in rendering its final judgment of disbarment, nothing in the rules provides for disbarment or restitution for only specific violations that involve an element of scienter.").

Texas is not alone in defining "sexually violent offenses" to encompass those that are "sexually motivated." The SVP statutes of several states provide that certain "sexually motivated offenses" are considered "sexually violent offenses" for commitment purposes. These states include:

- Arizona (murder, assault, false imprisonment, and first-degree burglary, among others);
- Florida (any criminal act determined to be sexually motivated);
- Illinois (first-degree murder);
- Iowa (any criminal act determined to be sexually motivated);
- Kansas (any criminal act determined to be sexually motivated);
- Washington (murder, assault, kidnapping, first-degree burglary, among others).[6]

6. Ariz.Rev.Stat. § 36–3701(6)(b), (7)(a) (LexisNexis 2008); Fla. Stat. Ann. § 394.912(8), (9)(h), 10 (LexisNexis 2008); 725 Ill. Comp. Stat. Ann. § 207/5 (d), (e)(2), (f) (LexisNexis 2008); Iowa Code Ann. § 229A.2 (9), (10)(g), (11) (LexisNexis 2008); Kan. Stat. Ann. § 59–29a02 (a), (d), (e)(13) (LexisNexis 2008); Wash. Rev.Code Ann. §§ 9.94A.030(43); 71.09.020(15) (LexisNexis 2008).

All of the above states, except Illinois, allow the "sexually motivated" determination to be made at the commitment proceeding.[7] By contrast, Illinois allows "the agency with jurisdiction" to determine if a first-degree murder was sexually motivated. 725 ILL. COMP. STAT. ANN. § 207/5 (e)(2) (LexisNexis 2008).

In this case, the State alleged that Miller committed two predicate offenses. The first was Stratton's murder, which the State alleged was "sexually motivated." Miller's other predicate offense was burglary of a habitation with intent to commit rape, an offense to which he pled guilty. Other states with similar statutes require only one predicate offense.[8] Thus, under the SVP statutes of other states, the single conviction of burglary with intent to rape could have been sufficient to allow those states to seek the person's commitment.

In finding the Kansas SVP statute constitutional, the *Hendricks* Court explained the evidentiary nature of prior commitments. *Hendricks*, 521 U.S. at 357, 117 S.Ct. 2072 (finding that the statute "requires evidence of past sexually violent behavior and a present mental condition that creates a likelihood of such conduct in the future if the person is not incapacitated."). *Hendricks*, however, "did not rely on the requirement of a prior conviction.

Rather, it noted that the concurrent presence of a mental abnormality and dangerousness was constitutionally sufficient." *Carta*, 503 F.Supp.2d at 409 (citing *Hendricks*, 521 U.S. at 358, 117 S.Ct. 2072).

In *Hendricks*, the Supreme Court approved a statutory scheme that allowed a commitment of an individual based on one prior charge or conviction of a sexually violent offense when that person suffered from a mental abnormality or personality disorder that made him likely to engage in predatory acts of sexual violence. *Hendricks*, 521 U.S. at 350–52, 117 S.Ct. 2072. One of Miller's convictions was for burglary with intent to commit rape, and with respect to this conviction the jury was not required to and did not retrospectively determine that it was a sexually motivated crime. By requiring two prior predicate offenses, Texas's SVP statutory scheme is more restrictive than the Kansas statute approved as constitutional in *Hendricks*. In addition, Texas's amended Act restricts civil commitments to those persons who suffer a behavioral abnormality.[9] TEX. HEALTH & SAFETY CODE ANN. § 841.003(a)(2). As a result, regardless of the nature of the person's prior offenses, the amended Act limits involuntary civil commitments to persons suffering from a

---

7. *See* ARIZ.REV.STAT. § 36–3701(6)(b); FLA. STAT. ANN. § 394.912(9)(h); IOWA CODE ANN. § 229A.2(10)(g); KAN. STAT. ANN. § 59–29a02(e)(13); WASH. REV.CODE ANN. § 71.09.020(15).

8. *See* ARIZ.REV.STAT. § 36–3701(7)(a) (LexisNexis 2008); CAL. WELF. & INST.CODE § 6600(a)(1) (LexisNexis 2008); FLA. STAT. ANN. § 394.912(10) (LexisNexis 2008); 725 ILL. COMP. STAT. ANN. § 207/5 (f) (LexisNexis 2008); IOWA CODE ANN. § 229A.2(11) (LexisNexis 2008); KAN. STAT. ANN. § 59–29a02(a) (LexisNexis 2008); MASS. ANN. LAWS ch. 123A, § 1 (LexisNexis 2008); Mo. ANN. STAT. § 632.480(5)(a) (LexisNexis 2008); N.H. REV. STAT. ANN. § 135–E:2(XII)(a) (LexisNexis 2008); N.J. STAT. ANN. § 30:4–27.26 (Lexis-

Nexis 2008); N.Y. MENTAL HYG. LAW § 10.03(g)(1) (LexisNexis 2008); S.C.CODE ANN. § 44–48–30(1)(a) (LexisNexis 2008); VA. CODE ANN. § 37.2–900 (LexisNexis 2008); WASH. REV.CODE ANN. § 71.09.020(16) (LexisNexis 2008); WIS. STAT. ANN. § 980.01(7) (LexisNexis 2007).

9. " 'Behavioral abnormality' means a congenital or acquired condition that, by affecting a person's emotional or volitional capacity, predisposes the person to commit a sexually violent offense, to the extent that the person becomes a menace to the health and safety of another person." TEX. HEALTH & SAFETY CODE ANN. § 841.002(2).

volitional impairment that renders them dangerous beyond their control. *See Hendricks,* 521 U.S. at 358, 117 S.Ct. 2072.

■ A party challenging the State's intent to establish a civil statute must provide "'the clearest proof'" that the statute's purpose or effect is so punitive that the State's intention is negated. *Fisher,* 164 S.W.3d at 647 (quoting *Hendricks,* 521 U.S. at 361, 117 S.Ct. 2072). Miller has not met this burden. In view of the evidentiary nature of predicate offenses, the absence of a general scienter requirement in the Texas statute, and the restrictive nature of the Texas statute, we are not persuaded by Miller's scienter argument that the amended Act is punitive.

We now consider Miller's argument that the legislature passed the amendments to further punish him for prior crimes.

### Retribution

Miller argues that the testimony and statements presented on behalf of Senate Bill 912[10] (an Act Relating to the Civil Commitment of Sexually Violent Predators) portrayed the amendments to the Texas Act "as measures to compensate for perceived past weaknesses in the Texas criminal justice system as a whole and in the prosecutions of Respondent Wesley Miller in particular." Miller points to comments made by State Senator Florence Shapiro during a hearing before the Senate Committee on Criminal Affairs on April 12, 2005, and argues:

> State Senator Florence Shapiro, the bill's sponsor, speculated that, in the past, many offenders were charged with a greater offense not contemplated by the original SVP Act rather than "the underlying sex offense that motivated the inmate," and that "many of these offenders were convicted under the man-

datory sentencing laws of the 70s and 80s and they are now being released from TDCJ on a flat discharge."

Senator Shapiro was the bill's sponsor, and she made the statements Miller attributes to her. But, she also made a number of other comments relating to proposed amendments to the Act, such as those addressing: 1) the costs of global-positioning tracking used in the program, 2) the suspension of commitment under certain circumstances, and 3) the biennial examinations required under the Act. *See* TEX. HEALTH & SAFETY CODE ANN. §§ 841.084, .101, .150 (Vernon 2003 & Supp.2007).

The audio-taped transcript of the hearing also contains testimony from certain witnesses: Lisa Gabbert, Rona Stratton Smith, Wichita County District Attorney Barry Macha, Tarrant County Assistant District Attorney Mitch Poe, and Gina De-Bottis, chief prosecutor for the Special Prosecution Unit. Gabbert and Smith were, respectively, the friend and sister of Retha Stratton. Macha prosecuted Miller on the previously discussed charge of burglary with intent to commit rape, and Poe represented the district attorney's office that prosecuted Miller for Stratton's murder. While all four of these witnesses referred to Miller, they did so in the context of explaining that Miller's murder conviction was an example of what the proposed amendments would enable the statute to reach.

Also included on the audio-tape are comments from the committee chairman, John Whitmire, and a committee member, Tommy Williams. Whitmire noted that the amendments would cover Miller and others like him. In addressing questions to witness DeBottis, Williams indicated that he did not want a lack of funding to prevent offenders such as Miller and others

10. *See* 2005 Tex. Gen. Laws 2890–93.

from being candidates for civil commitment. DeBottis, the State's prosecutor in SVP cases, testified that she considered the funding to be adequate.

Having reviewed the entire transcript of Senate Bill 912's hearing, we conclude that the witnesses used Miller's crime as an example of an offense that could be considered under the proposed amendments in an SVP commitment proceeding.[11] Thus, we further conclude that Miller has failed to provide " 'the clearest proof' " that the amendments have made the Act so retributive and punitive " 'in either purpose or effect.' " *Fisher,* 164 S.W.3d at 647 (quoting *Hendricks,* 521 U.S. at 361, 117 S.Ct. 2072). Consequently, Miller has not met his burden to overcome the State's evidence that the legislature intended the Act's nature to be civil. *See Hendricks,* 521 U.S. at 361, 117 S.Ct. 2072; *Fisher,* 164 S.W.3d at 647. In view of the foregoing, we decline to infer "retribution" from "example" testimony and decline to find that the amendments' legislative history causes them to be punitive and violative of Miller's due process rights. We overrule issue one.

## V. Other Constitutional Arguments:
### Double Jeopardy, Bill of Attainder, and Vagueness

In issues two, three, and four, Miller argues the amended Act violates his constitutional rights. Issue two asserts that re-litigation of Retha Stratton's murder was prohibited by the double jeopardy clause. Issue three argues the amendments are prohibited bills of attainder.[12] Issue four contends the amended Act is void for vagueness.

### Double Jeopardy

The Double Jeopardy Clause [13] is "generally understood to preclude a second prosecution for the same offense[.]" *Hendricks,* 521 U.S. at 369, 117 S.Ct. 2072. In addition, it prohibits the state from " 'punishing twice, or attempting a second time to punish criminally, for the same offense.' " *Id.* (quoting *Witte v. United States,* 515 U.S. 389, 396, 115 S.Ct. 2199, 132 L.Ed.2d 351(1995)). But, initiation of

---

11. The inclusion of "sexually motivated" offenses in the definition of sexually violent offenses did not originate in Texas. Other states, including Arizona, Florida, Illinois, Washington, and Wisconsin, had such statutes several years before Texas considered the amendments in 2005. *See In re Commitment of Taylor,* 206 Ariz. 355, 78 P.3d 1076, 1080 n. 4 (App.2003) (explaining that statute defining "sexually motivated" for SVP purposes was enacted in 1995); *Barker v. State,* 877 So.2d 59, 60 (Fla. 4th Dist.Ct.App.2004) (explaining that in prosecuting a 1999 SVP commitment petition based on burglary as predicate offense, State was required to prove beyond reasonable doubt that the burglary was a sexually motivated offense); *In re Detention of Samuelson,* 189 Ill.2d 548, 244 Ill. Dec. 929, 727 N.E.2d 228, 231–32 (2000) (explaining that SVP statute defines sexually violent offense to include "first degree murder, if it is determined by the agency with jurisdiction to have been sexually motivated . . .");

*In re Stout,* 159 Wash.2d 357, 150 P.3d 86, 90, 99 (2007) (affirming court of appeals decision upholding 2003 SVP commitment based on burglary that was sexually motivated); *State v. Watson,* 227 Wis.2d 167, 595 N.W.2d 403, 409 (1999) (explaining in a 1999 opinion that certain offenses, such as false imprisonment, can be predicate offenses for SVP commitment if the offenses were determined to be "sexually motivated").

12. Under common law, attainder was "the act of extinguishing a person's civil rights when that person is sentenced to death or declared an outlaw for committing a felony or treason." BLACK'S LAW DICTIONARY 137 (8th ed.2004).

13. The Double Jeopardy Clause provides: "[N]or shall any person be subject for the same offence to be twice put in jeopardy of life or limb." U.S. CONST. amend. V.

civil commitment proceedings "does not constitute a second prosecution." *Id.* at 368, 117 S.Ct. 2072. Just as important is that a commitment under an SVP statute "is not tantamount to punishment[.]" *Id.* ("If an individual otherwise meets the requirements for involuntary civil commitment, the State is under no obligation to release that individual simply because the detention would follow a period of incarceration."). Because we have determined that the amended Act continues to be civil in nature, and because the commitment is not punishment for a prior offense, we conclude that the commitment proceedings against Miller did not violate double jeopardy principles. *See id.* Issue two is overruled.

### Bill of Attainder

■ The United States Constitution prohibits Congress and the states from passing bills of attainder. U.S. CONST. art. I, §§ 9, 10. A bill of attainder is "a law that legislatively determines guilt and inflicts punishment upon an identifiable individual without provision of the protections of a judicial trial." *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 468, 97 S.Ct. 2777, 2803, 53 L.Ed.2d 867 (1977) (finding that legislation directing an official of the legislative branch to take custody of Nixon's papers and tape recordings did not constitute a bill of attainder).

■ Three inquiries determine whether a statute inflicts punishment: "(1) whether the challenged statute falls within the historical meaning of legislative punishment; (2) whether the statute, 'viewed in terms of the type and severity of burdens imposed, reasonably can be said to further nonpunitive legislative purposes'; and (3) whether the legislative record 'evinces a congressional intent to punish.'" *Selective Serv. Sys. v. Minn. Pub. Interest Research Group*, 468 U.S. 841, 852, 104 S.Ct. 3348,

82 L.Ed.2d 632 (1984) (quoting *Nixon*, 433 U.S. at 473, 475–76, 478, 97 S.Ct. 2777).

Under all three of the *Selective Service* inquiries, the Texas statute does not inflict punishment. *See id.* First, "[h]istorically, civil commitment has not been viewed as punishment." *Fisher*, 164 S.W.3d at 648. Second, *Fisher* further notes that "the Act is rationally connected to its twin goals of 'long-term supervision and treatment.'" *Id.* at 651 (quoting TEX. HEALTH & SAFETY CODE ANN. § 841.001). Thus, the long-term nonpunitive purposes of protecting the public from sexually violent predators and of treating persons found to be sexually violent predators are furthered. Third, as we discussed in issue one, the legislative history of the amended Act does not show any legislative intent to further punish sexually violent predators. We conclude that Miller's argument that the Act, as amended, is a bill of attainder is also without merit, and we overrule issue three.

### Vagueness

In issue four, Miller contends that the statutory definition of "based on sexually motivated conduct" is impermissibly vague. He argues that the statute is so vague it permits arbitrary and discriminatory enforcement. *See Grayned v. City of Rockford*, 408 U.S. 104, 108–09, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972) ("A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application."). Miller argues that

> the term "based on sexually motivated conduct" and the definition of "sexually motivated conduct" fail to provide the degree of clarity required by due process. They fail to provide either adequate notice to those who could fall within the scope of the amendment or notice

of what conduct is forbidden, rendering Section 841.002(8)(D) ... unconstitutional—facially and as applied to Mr. Miller.

■ The vagueness doctrine is derived from the Fifth Amendment's Due Process Clause. *United States v. Williams,* —— U.S. ——, 128 S.Ct. 1830, 170 L.Ed.2d 650, 76 U.S.L.W. 4275 (2008). When an appellant brings both a "facial" and an "as applied" challenge, we consider the "as applied" challenge first. *See Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 494–95, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982). A party whose conduct "is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others." *Id.* at 495, 102 S.Ct. 1186. Therefore, we "examine the complainant's conduct before analyzing other hypothetical applications of the law." *Id.* If First Amendment rights are not implicated, we will sustain a vagueness challenge only if the statute is vague in all of its applications. *Id.* at 494–95, & n. 7, 102 S.Ct. 1186; *see Fisher,* 164 S.W.3d at 655 & n. 15 (recognizing that appellant may bring a facial challenge without an "as applied" challenge when First Amendment rights are involved but noting "heavy burden" of showing unconstitutionality "in every possible application"). In this case, Miller does not contend that the statute involves any particular rights affected by the First Amendment.

■ Miller's "as applied" argument is brief. He contends that at his commitment trial, several different ideas were expressed about the meaning of "sexually motivated conduct." Miller's entire "as applied" argument states:

Indeed, at the trial, licensed psychologists, psychiatrists, and lawyers all had different ideas about what the phrase meant. Dr. Price thought the stab wounds revealed "sexual thinking." Some theorized that if there was a sexu-

al encounter before the murder, that somehow the murder was automatically based on sexually motivated conduct, which would be good enough to make the murderer a sexually violent predator. The State seemed to think that "I just have to show that there was some sexually motivated conduct which the murder was based on either before, during, or after the murder."

Miller's argument, however, overlooks several points: (1) the complete definition of "sexually motivated conduct" as provided in the statute, (2) his testimony at trial and his statement, and (3) the entirety of the experts' testimony.

The SVP Act defines "sexually motivated conduct" as "any conduct involving the intent to arouse or gratify the sexual desire of any person immediately before, during, or immediately after the commission of an offense." TEX. HEALTH & SAFETY CODE ANN. § 841.002(7–a). Section 841.002(8)(D) uses the phrase "sexually motivated conduct" to define two types of "sexually violent offenses," namely, murder and capital murder that are "determined beyond a reasonable doubt to have been based on sexually motivated conduct." *Id.* § 841.002(8)(D); *see also* TEX. PEN.CODE ANN. §§ 19.02, 19.03 (Vernon 2003 & Supp.2007).

The Act, thus, defines "sexually motivated conduct" in common terms ("intent to arouse or gratify the sexual desire"). The statute further limits its context to a particular time period (conduct occurring "immediately before, during, or immediately after" the offense) and to particular offenses (murder and capital murder). TEX. HEALTH & SAFETY CODE ANN. § 841.002(7–a); *see Williams,* 128 S.Ct. at 1845; *see also* TEX. PEN.CODE ANN. §§ 19.02, 19.03.

As applied to Miller, his testimony alone shows that immediately before Stratton's

murder, he was present in her apartment to satisfy his sexual desires. At the commitment trial, Miller testified that he went to Stratton's apartment that night for "sex." Miller's statement about the events leading to Stratton's murder showed sexually motivated conduct.

Miller's testimony is not the only evidence that Miller acted to gratify his sexual desires "immediately before, during, or immediately after" he murdered Stratton. As outlined above, two of the three expert witnesses opined that Stratton's murder was "sexually motivated."

While the boundaries of "sexually motivated conduct" as used in the Act may be difficult to discern, that does not mean it is difficult to determine that Miller's conduct clearly fell within them. We conclude that the statute is not impermissibly vague as applied to Miller. As noted above, Miller does not contend that the statute impacts First Amendment rights. *See Hoffman,* 455 U.S. at 494–95 & n. 7, 102 S.Ct. 1186; *Fisher,* 164 S.W.3d at 655 & n. 15. Thus, because the statute is not impermissibly vague as applied to Miller, it is not impermissibly vague in all of its applications. *See Hoffman,* 455 U.S. at 494–95 & n. 7, 102 S.Ct. 1186; *Fisher,* 164 S.W.3d at 655 & n. 15. Consequently, Miller fails to meet his burden of showing facial invalidity. We overrule issue four.

## VI. Jury Charge

In issues five and six, Miller complains about the jury charge. Issue five argues that the trial court should have asked the jury to find whether, beyond a reasonable doubt, Miller's conduct was sexually motivated when he murdered Stratton. Issue six contends that the trial court erred by failing to define "sexually motivated conduct" in the jury charge.

Miller's argument addresses the portion of the charge that posed the following question to the jury: (1) "Do you find beyond a reasonable doubt that Wesley Miller is a repeat sexually violent offender?" The charge given by the court further defined "repeat sexually violent offender" as meaning that "a person has been convicted of more than one sexually violent offense and a sentence is imposed for at least one of the offenses...." In turn, the charge also defined "sexually violent offense" as meaning:

. . . .

(C) an offense under [Texas Penal Code] Section 30.02, Burglary, if the offense is punishable under Subsection (d) of that section, (the premises are a habitation and the party to [the] offense entered the habitation with the intent to commit, attempted to commit or did commit a felony other than felony theft) and the person committed the offense with the intent to commit an offense listed in Paragraph (A) or (B); [14]

(D) an offense under Texas Penal Code, Section 19.02 or 19.03, Murder or Capital Murder, that during the guilt or innocence phase or the punishment phase for the offense, during the adjudication or disposition of delinquent conduct constituting the offense, *or subsequently during a civil commitment proceeding trial, is determined beyond a reasonable doubt to have been based on sexually motivated conduct* [.]

. . . .

---

**14.** Paragraphs (A) and (B) of the charge designated the following as "sexually violent offenses": indecency with a child, sexual assault, aggravated sexual assault, and aggra- vated kidnapping if the person committed the offense with the intent to violate or abuse the victim sexually.

*See* Tex. Health & Safety Code Ann. § 841.002(8) (emphasis added). We consider issue six first.

### Sexually Motivated Conduct

 Miller contends that the jury charge also should have contained the statutory definition of "sexually motivated conduct." Rule 277 of the Texas Rules of Civil Procedure requires that a trial court submit instructions and definitions that are proper to enable the jury to render a verdict. *See* Tex.R. Civ. P. 277. Generally, definitions of legal or technical terms are included in the charge. *See Brookshire Bros., Inc. v. Lewis*, 997 S.W.2d 908, 921 (Tex.App.-Beaumont 1999, pet. denied). Under the Act, "sexually motivated conduct" is "any conduct involving the intent to arouse or gratify the sexual desire of any person immediately before, during, or immediately after the commission of an offense." Tex. Health & Safety Code Ann. § 841.002(7-a). While Miller makes a strong argument that the definition, had it been given, would have assisted the jury, we first consider whether the alleged error in refusing his definition was preserved.

 "We review a trial court's decision to submit or refuse a particular instruction under an abuse of discretion standard of review. The trial court has considerable discretion to determine necessary and proper jury instructions." *In re V.L.K.*, 24 S.W.3d 338, 341 (Tex.2000) (citations omitted). Texas's procedural rules, however, provide "that any complaint to a jury charge is waived unless specifically included in an objection." *In re B.L.D.*, 113 S.W.3d 340, 349 (Tex.2003) (citing Tex.R. Civ. P. 274; Tex.R.App. P. 33.1(a)(1)). "A party must make the trial court aware of the complaint, timely and plainly, and obtain a ruling." *Id.* (citing *State Dep't of Highways & Pub. Transp. v. Payne*, 838 S.W.2d 235, 241 (Tex.1992)).

In this case, Miller made no specific objection to the lack of a definition of "sexually motivated conduct." After hearing arguments on the proposed jury questions, the trial court asked the parties whether they had other requested questions, definitions, or objections to the charge. The record of the charge conference shows that Miller's counsel raised numerous objections and requests. Counsel requested the inclusion of the term "beyond a reasonable doubt" in the charge's opening paragraph. He requested an instruction that the respondent's behavioral abnormality must be based on the respondent's present mental state. Counsel objected to the presence of the phrase "upon the answers made" in instruction 6 and sought to replace it with "upon each answer made." He requested an instruction that the State had the burden of proof. He requested a substitute instruction on "behavioral abnormality." He also requested an instruction on the quantum of proof for determining behavioral abnormality. But, counsel did not request that the trial court include the statutory definition of "sexually motivated conduct," or otherwise object when the court did not.

At the close of the charge conference, Miller's counsel requested permission to file, by the following morning, his written "requested definitions and instructions," and he requested permission to file written objections to the charge. The trial court agreed and stated: "If ... on separate pages you will present your definitions you want and the questions you want, and then I ... assume they will be consistent with what you presented in your respondent's proposed jury charge; is that correct, sir?" Counsel responded: "They will, Your Honor."

The next morning, Miller's counsel filed separate requests for the following addi-

tions to the jury charge: (1) a definition on behavioral abnormality; (2) an instruction on quantum of proof; and (3) questions on whether Miller's conduct was sexually motivated when he committed the murder and whether he committed the burglary with the intent to commit aggravated sexual assault. Miller's counsel also filed three objections to the jury charge: (1) seeking to omit the words "emotional or" from the definition of "behavioral abnormality;" (2) objecting to the failure to add a characterization of the quantum of proof required on "behavioral abnormality;" and (3) objecting to the question, "Do you find beyond a reasonable doubt that Wesley Miller is a repeat sexually violent offender?" and seeking to add instead a question on whether Miller's conduct was sexually motivated when he committed the murder. In addition to his requested definition, instruction, questions, and objections, Miller's counsel filed an alternative charge that is six pages in length. On page two of the alternative charge we find Miller's proposed definition of "sexually motivated conduct," a definition that he never sought at the charge conference nor submitted separately as requested by the trial court.

While Rule 273 of the Texas Rules of Civil Procedure "does not prohibit including the request in a complete charge," the request must not be obscured. *Alaniz v. Jones & Neuse, Inc.*, 907 S.W.2d 450, 451 (Tex.1995); *see* TEX.R. CIV. P. 274. We conclude the definition of "sexually motivated conduct" that Miller requested was obscured by other questions, additional definitions, additional instructions, and by his representation to the trial court on the previous day that the requests would be consistent with those he had asserted at the hearing. *See Munoz v. Berne Group, Inc.*, 919 S.W.2d 470, 472 (Tex.App.-San Antonio 1996, no writ). The *Munoz* Court explained that there was "no indication" that counsel brought the requested in-

struction to the attention of the court. *Id.* "Tendering this instruction to the court in the form of an entire proposed charge, with nothing more, was insufficient to preserve error." *Id.* The court noted that counsel raised only one objection at the formal charge conference and that objection related to another issue. *Id.* The *Munoz* Court further noted that the record did not indicate that Munoz brought his objection about the lack of an instruction to the trial court's attention. *Id.*

In this case, the record does not show that the trial court was aware Miller wanted the definition of "sexually motivated conduct" in the charge. Miller's counsel did not request the definition at the charge conference, though he made several other requests and objections, and he did not file a separate request for the definition on the morning following the charge conference as directed by the court. Instead, the definition was obscured in the charge and never discussed with the court. Consequently, we find that Miller did not make the trial court reasonably aware of his requested definition. *See Alaniz*, 907 S.W.2d at 451 (citing *Payne*, 838 S.W.2d at 241).

Because Miller failed to preserve error on his jury instruction argument, we do not decide whether the trial court erred in failing to provide the jury with the definition of "sexually motivated conduct" contained within Miller's charge. We overrule issue six.

### Proposed Jury Question

■ In issue five, Miller contends that the trial court should have included an additional question in the charge. The trial court's charge asked the following questions: (1) "Do you find beyond a reasonable doubt that Wesley Miller is a repeat sexually violent offender?" and (2)

"Do you find beyond a reasonable doubt that Wesley Miller suffers from a behavioral abnormality that makes him likely to engage in a predatory act of sexual violence?" Miller contends that the trial court should have also asked another question, namely whether Stratton's murder was based on sexually motivated conduct.

Miller argues the trial court abused its discretion by refusing to submit "the most important question in the trial." Miller further contends that the trial court already had utilized its discretion under Rule 277 to abandon broad-form submission when it submitted two questions to the jury rather than one. He argues that the court's refusal to submit an additional question "was arbitrary, unreasonable, and [made] with only selective reference to guiding principles of law." The State responds that because the trial court tracked the statutory language and submitted the charge in broad form, the trial court did not abuse its discretion.

■■■■ "A trial court must submit in its charge to the jury all questions, instructions, and definitions raised by the pleadings and evidence. When feasible, jury questions should be in broad form, accompanied by appropriate instructions and definitions." *Hyundai Motor Co. v. Rodriguez ex rel. Rodriguez,* 995 S.W.2d 661, 663–64 (Tex.1999) (footnotes omitted); *see also Tex. Dep't of Human Servs. v. E.B.,* 802 S.W.2d 647, 649 (Tex.1990) (upholding broad-form submission in proceeding to terminate parental rights). "The goal of the charge is to submit to the jury the issues for decision logically, simply, clearly, fairly, correctly, and completely. Toward that end, the trial judge is accorded broad discretion so long as the charge is legally correct." *Rodriguez* at 664 (footnote omitted).

From the definitions the trial court gave, the jury knew that a "repeat sexually violent offender" was a person who had "been convicted of more than one sexually violent offense." To meet its burden of showing that Miller was a repeat sexually violent offender, the State presented the jury with evidence of two predicate offenses: the burglary, which is not at issue in this appeal, and the murder. The charge defined "sexually violent offense" as including murder or capital murder "determined beyond a reasonable doubt to have been *based on sexually motivated conduct.*" (emphasis added). The jury question asked whether Miller was a repeat sexually violent offender. The question, thus, required the jury to determine that Stratton's murder was sexually motivated, based on the charge definitions and the evidence before the jury.

We presume the jury followed the trial court's instructions. *See Golden Eagle Archery, Inc. v. Jackson,* 116 S.W.3d 757, 771 (Tex.2003); *Turner, Collie & Braden, Inc. v. Brookhollow, Inc.,* 642 S.W.2d 160, 167 (Tex.1982). Thus, presuming the jury followed the instructions and applied the charge's definition of sexually violent offense to the murder offense, we find the jury necessarily concluded, beyond a reasonable doubt, that the murder Miller committed was based on sexually motivated conduct. Otherwise, the jury could not have followed the instructions and still have found that, beyond a reasonable doubt, Miller was a repeat sexually violent offender.

With respect to the disputed issues involved in Miller's trial, we conclude that it was feasible for the trial court to submit the issues in a broad-form charge. *See Crown Life Ins. Co. v. Casteel,* 22 S.W.3d 378, 390 (Tex.2000). As a result, we hold that the trial court was not required to submit Miller's separate question about whether Stratton's murder was based on

sexually motivated conduct. We overrule issue five.

## VII. Res Judicata

██ In issue seven, Miller contends that the doctrine of res judicata bars the State from proving that sexual motivations caused him to commit Stratton's murder. Miller argues that during his murder trial, the State could have litigated whether sexually motivated conduct caused him to murder Stratton.

 Res judicata precludes the relitigation of claims that have been finally adjudicated, or that arise out of the same subject matter and that could have been litigated in the prior action. *Barr v. Resolution Trust Corp. ex. rel Sunbelt Fed. Sav.*, 837 S.W.2d 627, 631 (Tex.1992). A criminal trial, such as Miller's trial for Stratton's murder, generally resolves the issues of whether an offender committed the elements of a specific offense beyond a reasonable doubt. *See* TEX. PEN.CODE ANN. § 2.01 (Vernon 2003) ("[N]o person may be convicted of an offense unless each element of the offense is proved beyond a reasonable doubt."). In an SVP commitment proceeding, however, prior sexually motivated offenses are evidentiary in nature. *Hendricks*, 521 U.S. at 362, 117 S.Ct. 2072. The offenses assist in demonstrating whether the offender has a behavioral abnormality and whether he will be dangerous in the future—the core issues in an SVP case. *Id.; see* TEX. HEALTH & SAFETY CODE ANN. § 841.003(a)(2). "Present behavioral abnormality" and "future dangerousness" of an alleged sexually violent predator are not issues that necessarily arise out of the same subject matter litigated during a prior criminal trial, and there is no showing that they do so here. *See Barr*, 837 S.W.2d at 628.

Further, Miller's civil commitment could not have been litigated at the time of his murder trial. *See Barr*, 837 S.W.2d at 628. There was no SVP statute at that time; the statute was enacted in 1999. *See* Civil Commitment of Sexually Violent Predators Act, 76th Leg., R.S., ch. 1188, § 4.01, 1999 Tex. Gen. Laws 4143–52 (codified as amended at TEX. HEALTH & SAFETY CODE ANN. ch. 841). In addition, Miller points to no provisions in the Code of Criminal Procedure that would permit a trial court to join criminal and civil proceedings.

Thus, we conclude that res judicata does not bar the State from showing that Miller's prior offense was caused by sexually motivated conduct. We overrule issue seven.

## VIII. Child Safety Zone

██ In issue eight, Miller contends that the trial court erred when it established a child safety zone in its commitment order. Miller contends that under the SVP statute, the civil-commitment trial judge must follow the requirements and restrictions applying to child safety zones established by the Texas Code of Criminal Procedure. *See* TEX.CODE CRIM. PROC. ANN. art. 42.12, § 13B (Vernon Supp.2007) (community supervision for sexual offenses against children). Specifically, Miller argues that because the evidence did not establish that any of his victims were children, the trial court was not authorized to restrict his contact with children. We disagree.

Under the SVP Act, section 841.082 allows the trial court to establish a child safety zone. In pertinent part, the Act provides:

(a) Before entering an order directing a person's outpatient civil commitment, the judge shall impose on the person requirements necessary to ensure the person's compliance with treatment and

supervisions and to protect the community. The requirements shall include:

. . . .

(7) if determined appropriate by the judge, establishing a child safety zone in the same manner as a child safety zone is established by a judge under Section 13B, Article 42.12, Code of Criminal Procedure, and requiring the person to comply with requirements related to the safety zone[.] [15]

. . . .

(9) *any other requirements determined necessary by the judge.*

. . . .

TEX. HEALTH & SAFETY CODE ANN. § 841.082 (Vernon Supp.2007) (emphasis added).

Thus, we must determine whether the legislature intended to limit a trial court's discretion and allow it to create a child safety zone only under the precise circumstances described in section 13B. *See* TEX. CODE CRIM. PROC. ANN. art. 42.12, § 13B. In light of the broad discretion granted to the trial court in subsection (a)(9) of section 841.082, we conclude the legislature did not intend to limit the trial court to the 13B criteria.

When construing a statute, our objective is determining and giving effect to the legislature's intent. *See Liberty Mut. Ins. Co. v. Camacho,* 228 S.W.3d 453, 458 (Tex. App.-Beaumont 2007, pet. denied). "When the meaning of a word in a statute is not ambiguous, we ordinarily give the word its common meaning." *Id.* When determining a word's common use, we look to commonly-used dictionaries for assistance. *Id.* But, "our review is not confined to isolated words, phrases, or clauses; rather, we examine the entire act." *Id.; see* TEX. GOV'T

CODE ANN. § 311.011(a) (Vernon 2005) (instructing courts to construe words and phrases in context).

When it passed the SVP Act, the legislature clearly established its intent. Section 841.001 stated:

The legislature finds that a small but extremely dangerous group of sexually violent predators exists and that those predators have a behavioral abnormality that is not amenable to traditional mental illness treatment modalities and that makes the predators likely to engage in repeated predatory acts of sexual violence. The legislature finds that the existing involuntary commitment provisions . . . are inadequate to address the risk of repeated predatory behavior that sexually violent predators pose to society. The legislature further finds that treatment modalities for sexually violent predators are different from the traditional treatment modalities for persons appropriate for involuntary commitment. . . . Thus, the legislature finds that a civil commitment procedure for the long-term supervision and treatment of sexually violent predators is necessary and in the interest of the state.

TEX. HEALTH & SAFETY CODE ANN. § 841.001 (Vernon 2003). Thus, we construe the Act to effectuate the legislature's two stated goals: long-term supervision and treatment of sexually violent predators.

The Act allows the judge the discretion to establish a child safety zone for a sexually violent predator "in the same manner" as a child safety zone is established under Section 13B. "Manner" means "the mode or method in which something is done or happens." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1376 (2002). When a

---

**15.** Under 13B, the trial court "shall establish" a child safety zone if the defendant's victim was a child as defined by section 22.011 of the Penal Code (sexual assault). The Penal Code defines a child as "a person younger than 17 years of age who is not the spouse of the actor." TEX. PEN.CODE ANN. § 22.011(c) (Vernon Supp.2007).

child safety zone is established under 13B, the defendant may not

(A) supervise or participate in any program that includes as participants or recipients persons who are 17 years of age or younger and that regularly provides athletic, civic, or cultural activities; or

(B) go in, on, or within 1,000 feet of a premises where children commonly gather, including a school, daycare facility, playground, public or private youth center, public swimming pool, or video arcade facility[.]

Tex.Code Crim. Proc. Ann. art. 42.12, § 13B(1)(A), (B). In this case, the trial court's order is consistent with 13B's manner of restricting the offender.[16]

Given the legislative history of the Act, we conclude that the legislature did not intend to restrict a trial judge's ability to create a child safety zone to those cases in which the offender's victims were children. To the extent that the trial court may have deviated from 13B's "manner" of establishing a child safety zone, subsection (a)(9) expressly authorized the trial court to do so. See Tex. Health & Safety Code Ann. § 841.082(a)(9).

In this case, Miller's brief concedes that at the time of Stratton's murder, she had only recently finished high school. Or, as the trial court stated: "Wesley Miller's victims were aged near majority and could just as easily have been younger." We hold the trial court did not abuse its discretion in ordering Miller to comply with a child safety zone.

---

16. The trial court's commitment order provided as follows:

7. A child safety zone is established such that Wesley Miller shall not:

a. supervise or participate in any program that includes as participants or recipients persons who are 17 years of age or younger and that regularly provides athletic, civic, or cultural activities; or

Issue eight is overruled. Having overruled all of Miller's issues and arguments, we affirm the trial court's judgment and commitment order.

AFFIRMED.